IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JEFFREY P. FINE,                                )
                                                )
        Plaintiff / Counterclaim Defendant,     )
                                                )
    v.                                          )     1:14cv551 (LMB/TCB)
                                                )
SUN LIFE ASSURANCE COMPANY OF CANADA,           )
                                                )
        Defendant / Counterclaimant.            )

MEMORANDUM OPINION

This action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1001, et seq., arises from defendant Sun Life Assurance Company of Canada's ("Sun

Life" or "defendant") termination of plaintiff Jeffrey P. Fine's ("Fine" or "plaintiff") long-term

disability ("LTD") benefits.  The parties disagree as to whether Fine ceased being eligible to

receive LTD benefits under the terms of an employee benefit plan administered and insured by

Sun Life.  Specifically, Fine argues that he never ceased being eligible for LTD benefits and has

filed suit to recover the benefits that have accrued since Sun Life terminated his benefits (the

"ERISA claim").  In contrast, Sun Life argues that Fine has been ineligible for LTD benefits

since January 1, 2012, and has counterclaimed against Fine to recover payments made after that

date.  The parties' filed cross-motions for summary judgment on both the ERISA claim and the

counterclaim, on which the Court heard oral argument.  For the reasons discussed in open court

and those that follow, the Court finds that Sun Life did not abuse its discretion in terminating

Fine's benefits but that equitable considerations now prevent Sun Life from recouping most of

the amount previously paid in error.

## I.   BACKGROUND

Fine is the former president and CEO of CIBT Inc. ("CIBT" or "the company"), a McLean, Virginia, multinational travel document expediting company with hundreds of employees in the United States and abroad. S654, S1594-95, S1682-83.[1] He held this position from 2003 until his resignation on August 31, 2010, due to disability. S1593. During his tenure as CEO, Fine grew CIBT "from a small business with 65 employees to a well-recognized, worldwide expeditor of visas and passports," and he oversaw CIBT's acquisition of 20 different companies. S1594-95. His base compensation for 2010, his final year as CEO, was $407,201, exclusive of his annual bonus. S655, S1126.

Fine began seeing an attending physician for chronic pain in his back and lower extremities in 2004. S93, S434, S1641-42. Since that time, he has been diagnosed with failed back syndrome and nerve dysfunction, has sought treatment from many specialists, and has undergone a number of different procedures, all of which have failed to relieve his pain. S434-41, S444, S1641-42. Fine now takes prescription pain medications, including narcotics. S674, S1108-12, S1642. Due to his chronic pain and the effects of his medications, the conclusion was reached, in consultation with Fine's primary attending physician, that Fine could no longer perform his duties as CEO (part of which required him to travel extensively domestically and abroad). S94-95, S676-77, S1409, S1595, S1641-42. John Donoghue ("Donoghue"), who had served under Fine, took over the position of president and CEO on September 1, 2010. S1397.

Fine, who was 47 years old at the time of his resignation, remained with CIBT as Non-Executive Chairman, a position created exclusively for him, which he presently still holds.

---

[1] References to the administrative record, which is Bates labeled "SUN___," are cited as "S___." The parties have stipulated to the authenticity and completeness of the administrative record. See Stipulation of the Parties ¶ 1 [Dkt. No. 29].

S654, S1389, S1398.  In this capacity, Fine primarily functions as an advisor and mentor to

Donoghue on a part-time basis and attends regular meetings of the CIBT board of directors.  S55,

S1152, S1619.  Fine's first Non-Executive Chairman Agreement with CIBT, dated August 20,

2010 (the "2010 NEC Agreement"), provided in a section titled "Compensation" that he was

"entitled to" receive "$50,000 per year paid in ratable installments in accordance with the

Company's payroll practices" and "an annual bonus for calendar years beginning after December

31, 2010 in an amount determined by the Board in its sole discretion."  S1152-53.

Following a stock purchase involving CIBT's parent company, Fine executed a new Non-

Executive Chairman Agreement, effective December 15, 2011 (the "2011 NEC Agreement"), in

which his role as Non-Executive Chairman remained unchanged.  Compare S55 (describing

Fine's responsibilities under the 2011 NEC Agreement), with S1152 (describing Fine's

responsibilities under the 2010 NEC Agreement).  Fine's compensation also remained largely

unchanged except for minor alterations to the language of the "Compensation" section of the

2011 NEC Agreement, which provided that he was "entitled to" receive "an annual fee of

$50,000 per year . . . paid in ratable installments in accordance with the Company's payroll

practices" and he was "eligible to receive . . . a profit sharing bonus in such amount, if any, as

may be determined by the . . . Board, in its sole and absolute discretion, if the Company's

performance is sufficient."  S56.

Initially following his resignation as CEO, Fine also entered into a Consulting Agreement

through Everest Financial Corp. ("Everest"), his consulting company, to provide acquisitions

consultation to CIBT.  S1119-25.  CIBT paid Everest a $12,500 monthly retainer for these

services until May 31, 2011, at which time the Consulting Agreement terminated because of

Fine's inability to perform the required services due to his disability.  S21, S1120.  In addition,

3

Fine agreed in January 2012 to serve on the board of directors of Relectric Holdings, LLC ("Relectric"), a company unrelated to CIBT. S84-88. For this position, he is paid $50,000 per year through Everest. S84, S88.

At all relevant times, Fine was a participant in an employee benefit plan sponsored by CIBT (the "Plan") and insured by Sun Life. S654-57. Sun Life provides LTD benefits for the Plan under the terms of a group policy issued to CIBT (the "Policy"). S686-756 (full text of the Policy). CIBT delegated to Sun Life its entire authority to make all final determinations regarding benefits claims under the Plan, as well as the authority to construe the terms of the Policy.[2] S749. To qualify for LTD benefits under the Policy, a claimant must meet both medical and financial requirements.[3] See S704-05, S729. For employees earning $100,000 or more annually,[4] the following definitions apply:

---

[2] Specifically, the Policy states:

**Insurer's Authority**

The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this Policy.

Any decision made by Sun Life in the exercise of this authority, including review of denials of benefit, is conclusive and binding on all parties. Any court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves Sun Life's determinations are arbitrary and capricious.

S749.

[3] There are other eligibility requirements that are not at issue in this action. See S729.

[4] The Policy provides different definitions of certain terms for claimants who earned less than $100,000 annually pre-disability; however, those definitions are inapplicable here because Fine's earnings prior to becoming disabled exceeded $400,000 annually, exclusive of bonuses and extra compensation. See S655, S1126 (indicating Fine's 2010 salary was $407,201).

**Partial Disability or Partially Disabled** means the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation and the Employee has Disability Earnings of less than 80% of his Indexed Total Monthly Earnings. . . .

**Total Disability or Totally Disabled** means the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation. . . .

**Partial Disability Benefit**
. . .
If an Employee is Partially Disabled, the Net Monthly Benefit will be calculated based on the Partial Disability Benefit formula. An Employee qualifies for this benefit if:
> - the Employee is working and has Disability Earnings of more than 20% but less than 80% of his Indexed Total Monthly Earnings; and
> - the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.

**Total Disability Benefit**
. . .
If an Employee is Totally Disabled, the Net Monthly Benefit will be calculated based on the Total Disability Benefit formula. An Employee qualifies for this benefit if:
> - the Employee is not working or is earning less than 20% of his Indexed Total Monthly Earnings; and
> - the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.

S704-05, S729-30.[5] Additionally, the Policy provides that "Total or Partial Disability Benefits

will cease on the earliest of" a list of occurrences, including "the date the Employee is no longer

Totally or Partially Disabled," and, for an employee who earns $100,000 or more annually, "the

date the Employee's Disability Earnings exceed 80% of his Indexed Total Monthly Earnings."

S734.

---

[5] Sun Life does not dispute that Fine is unable to perform the "Material and Substantial Duties" of his "Own Occupation," as those terms are defined in the Policy. See S703-04 (defining these terms).

In turn, "Disability Earnings" means "the employment income an Employee receives while Partially Disabled or income an Employee receives while participating in an approved Rehabilitation program. Disability Earnings does not include income an Employee receives from work performed prior to his Total or Partial Disability, nor income that is not derived from work performed." S702. To determine whether a claimant's Disability Earnings exceed 80% of his Indexed Total Monthly Earnings, thereby rendering him ineligible for LTD benefits, Sun Life first calculates his "Total Monthly Earnings" ("TME"), which is defined as the "basic monthly earnings as reported by the Employer immediately prior to the first date Total or Partial Disability begins" but "does not include commissions, bonuses, overtime pay or any other extra compensation," and then applies an annual indexing adjustment.[6] S703, S706. The "Maximum Monthly Benefit" Sun Life will pay to an eligible claimant is $10,000. S692.

After Fine resigned as CEO, he timely filed a claim for LTD benefits under the Policy, listing September 1, 2010, as the date for the onset of his disability status. S54-56, S659-64. Sun Life initially denied Fine's claim in January 2011[7] because it concluded that his medical condition did not preclude him from performing the duties of a CEO and, instead, he had voluntarily chosen to resign from his position as president and CEO of CIBT. S1548, S1561-62.

---

[6] Specifically, "Indexed Total Monthly Earnings"

> means the Employee's Total Monthly Earnings prior to the date his Total or Partial Disability began adjusted on the first of the month following 12 calendar months of Partial Disability Benefit payments and each annual anniversary thereafter. Each adjustment to the Indexed Total Monthly Earnings is the lesser of 10% or the current annual percentage increase in the Consumer Price Index for Wage Earners and Clerical Workers as published monthly by the U.S. Department of Labor. . . .

S703.

[7] Although Sun Life's denial letter is dated "January 7, 2010," both parties agree that this was an error and that the letter should have been dated January 7, 2011. See Def. Mem. Supp. MSJ, Ex. A, at 47.

In its denial letter, Sun Life also indicated that even if Fine had met the medical criteria, its

independent consulting Certified Public Accountant ("CPA"), William G. Bristol ("Bristol"), of

Bristol Consulting Group, had been unable to calculate Fine's Disability Earnings due to missing

supporting documentation. S1557-59. Among other things, Sun Life stated that it needed

documentation clarifying the nature of the annual discretionary bonus provided under the 2010

NEC Agreement, including whether any bonus would be paid for the four months in 2010

following Fine's disability onset date and "the details of how the bonus was calculated in relation

to the CIBT 2010 [Executive] Bonus Plan." S1557-59; see also S1435-37 (Bristol's December

2010 report).

On appeal from its initial denial, Sun Life rendered a favorable decision on Fine's LTD

benefits claim on July 28, 2011, granting him benefits retroactively as of December 1, 2010.[8]

S1975-76. To analyze Fine's finances and calculate the amount of his monthly benefit, Sun Life

engaged the services of another independent CPA, Jeffrey J. Bannon ("Bannon"), of Bannon &

Company, P.C. Bannon calculated Fine's monthly benefit to be $10,000 for December 2010

through July 2011. S42. In calculating this monthly benefit, Bannon excluded from Fine's

Disability Earnings an annual bonus of $495,000 received in December 2010 and an additional

bonus of $100,000 received in March 2011 as attributable to "work performed prior to his date of

disability." S40-41. In addition, Bannon stated, "[A]s noted in my prior report, the information

submitted indicates that Mr. Fine will be eligible for an annual bonus in 2011. The bonus

amount is unknown at this time. However, when received it would be considered Disability

Earnings and should be pro-rated on a retrospective basis over the months worked in 2011."

---

[8] Fine received short-term disability benefits between September 1, 2010, and November 30, 2010. S43.

S42. Sun Life adopted Bannon's calculations and, in August 2011, it paid Fine the lump sum amount of benefits that had accrued from December 2010 through the end of July 2011 while Fine's administrative appeal of his claim was pending. S43-50. In a letter sent contemporaneously with Fine's lump sum payment, Sun Life reminded Fine that, under the terms of the Policy, "[t]he amount of benefits receive[d] under this claim may be reduced by income received from other sources. These sources include . . . future bonuses and some salary continuation programs. Any other eligible income received could be offset from eligible benefits." S44.

Under the Policy, LTD claimants are required to provide ongoing proof of their entitlement to benefits. Accordingly, in January 2013, Sun Life requested updated information regarding Fine's earnings since December 2011, S90-91, and forwarded the updated documentation it received to Bannon for further review. Bannon reported, in April 2013, that the nature of certain amounts reflected on Fine's tax forms for 2011 and 2012 was unclear but that if those amounts constituted Disability Earnings, Fine's Disability Earnings would have exceeded his TME for both 2011 and 2012. S161-62. Specifically, Bannon needed clarification regarding $1,412,488 Fine received in 2011 and $361,854.50 Fine received in 2012. S161-62. Sun Life informed Fine that he may have received an overpayment of benefits and asked him to send additional documentation clarifying the nature of those two amounts. S332. Sun Life also informed Fine that it was providing his July 2013 benefits "under reservation of rights pending receipt of the requested documentation." S332.

Fine responded to Sun Life's request through e-mails from his counsel. S409-33. In those e-mails, Fine's counsel explained that the $1,412,488 payment resulted from the 2011 sale of Fine's shares in CIBT. S410-11. Fine's counsel also explained that the $361,854.50 Fine

8

received in 2012 was comprised of $81,854.50, which represented the remaining amount of his

2011 annual bonus from CIBT, and $280,000, which represented his 2012 annual bonus from

CIBT. S410-11. Lastly, Fine's counsel elaborated that the 2012 annual bonus was "based on the

company's financial progress" rather than "on actual worked [sic] performed" by Fine; in

support, he quoted an email from Donoghue informing Fine of his 2012 bonus.[9] S410-11.

 Sun Life again forwarded Fine's response to Bannon, who issued a report on August 27,

2013. S454-56. In his report, Bannon acknowledged that the $1,412,488 "was paid pursuant to

a 'Sale Transaction Bonus' agreement," which "indicated that the amount of the bonus was

dependent on the valuation of the business and whether the sale was completed on or after" a

certain date. S454. Therefore, Bannon concluded that this payment "was not attributable to Mr.

Fine's employment activity but, rather, was directly related to the sale of the business" and so

should not be included in Fine's Disability Earnings. S454. In contrast, Bannon concluded that

the two bonus amounts should be included in Fine's Disability Earnings. S454. Bannon also

added to Fine's 2011 Disability Earnings a previously unaccounted for bonus of $81,855 that

Fine had received from CIBT in December 2011. S454. After excluding the payment from the

sale of the business and distributing the two bonuses attributable to 2011 across all months in

2011, Bannon calculated that Fine had been properly paid the $10,000 monthly benefit

throughout 2011. For 2012, Bannon distributed the $280,000 bonus across all months. S455.

With the addition of this bonus and the salary he began receiving from Relectric in 2012, Fine's

2012 Disability Earnings exceeded 80% of his Indexed TME, thereby rendering him ineligible

for LTD benefits. S455-56.

---

[9] Donoghue's email is quoted in full below. See infra Part II(B).

Adopting Bannon's calculations, Sun Life ceased paying Fine benefits on August 29, 2013, informing him that he had become ineligible for benefits as of January 1, 2012, because his Disability Earnings were too large. S460-68. Of the $330,000 total that Sun Life had paid to Fine, it asked him to return $200,000 to account for the LTD benefits he had received from January 2012 through August 2013 (a total of 20 months). S463, S467. Fine timely appealed on the ground that the $280,000 bonus from CIBT was a "profit sharing bonus," as indicated in the 2011 NEC agreement, and so did not fit the definition of Disabilty Earnings. S514-17. On appeal, Sun Life engaged Bristol to provide an independent analysis of Fine's financial records. In his report, Bristol considered the $280,000 bonus as part of Fine's Disability Earnings and distributed the bonus across all months of 2012, just as Bannon had. S614-15. Sun Life adopted Bristol's calculations and, by a letter dated January 31, 2014, Sun Life upheld its denial of Fine's claim and increased the amount it asked him to return to $203,121.01. S608-19. The increase was due to Bristol's determination, which Sun Life adopted, that Fine should not have been paid the full $10,000 for December 2011 under the terms of the Policy due to the application of a "proportionate loss formula." S611, S614.

Fine has exhausted all administrative remedies regarding the denial of his claim.[10] Fine filed his one-count Complaint alleging that Sun Life's termination of his LTD benefits violated ERISA § 502(a)(1)(B).[11] The Complaint requests that the Court declare that Fine is entitled to past and future LTD benefits. In response, Sun Life filed its Answer, along with a one-count

---

[10] Fine had the opportunity to raise a separate administrative appeal to challenge the overpayment calculation, the deadline for which had not yet expired at the time the parties filed their summary judgment memoranda.

[11] Section 502(a)(1)(B) of ERISA, codified at 29 U.S.C. § 1132(a)(1)(B), states that a participant or beneficiary in a plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

counterclaim to recover the alleged $203,121.01 overpayment pursuant to 29 U.S.C. § 1132(a)(3)(B).[12] Specifically, Sun Life requests that Fine "be required to make restitution to Sun Life" or, alternatively, that Fine "be disgorged of any assets wrongfully acquired with the overpaid LTD benefits, and/or a constructive trust should be imposed on Fine's assets up to the amount of the overpaid LTD benefits." Fine's answer to the counterclaim raises a number of defenses, including that the counterclaim fails to state a claim and that the counterclaim should be barred by the doctrines of estoppel, laches, and unclean hands. Fine's defenses also include barring the counterclaim because it seeks legal relief instead of "appropriate equitable relief" and because it does not seek specifically identifiable funds in Fine's possession. Both parties also seek costs and attorney's fees under ERISA.

The parties have filed cross-motions for summary judgment, in which they dispute the interpretation of the terms of the Policy—specifically whether the $280,000 bonus for 2012 constituted employment income that was "derived from work performed." The parties' cross-motions for summary judgment also address Sun Life's counterclaim.

## II.   DISCUSSION

### A.   Standard of Review

Generally, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "However, in actions brought under ERISA, summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment . . . do not apply." Tobey v. Keiter, Stephens,

---

[12] This provision states that a participant, beneficiary, or fiduciary of a plan may bring a civil action to obtain "appropriate equitable relief . . . to redress . . . violations or . . . to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B).

Hurst, Gary & Shreaves, No. 3:13-cv-315, 2014 WL 61325, at *3 (E.D. Va. Jan. 7, 2014), aff'd

585 F. App'x 837 (4th Cir. 2014).

"Although ERISA itself is silent on the standard for denials of benefits challenged under

§ 1132(a)(1)(B), Firestone [Tire & Rubber Co. v. Bruch] establishes that a de novo standard

applies 'unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan,' in which case the exercise

of assigned discretion is reviewed for abuse of discretion." Evans v. Eaton Corp. Long Term

Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008) (quoting Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 115 (1989)). Here, both parties agree that the company delegated to Sun

Life such discretionary authority and that, as a result, the abuse of discretion standard applies to

the Court's review of Sun Life's interpretation of the Policy and its eligibility determination.

Under the abuse of discretion standard, a court should defer to a plan fiduciary's decision if it is

reasonable, even if the court would have come to a different conclusion independently. Booth v.

Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 341-42 (4th Cir. 2000).

"The 'deference that is the hallmark of abuse-of-discretion review,' is deference enough to

appreciate reasonable disagreement." Evans, 514 F.3d at 322 (quoting Gen. Elec. Co. v. Joiner,

522 U.S. 136, 143 (1997)). A plan fiduciary's "decision is reasonable if it is the result of a

deliberate, principled reasoning process and if it is supported by substantial evidence." Id.

(internal quotation marks omitted).

The Fourth Circuit has articulated eight non-exhaustive factors (the "Booth factors")

relevant to the abuse of discretion analysis in ERISA lawsuits:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the
> adequacy of the materials considered to make the decision and the degree to
> which they support it; (4) whether the fiduciary's interpretation was consistent
> with other provisions in the plan and with earlier interpretations of the plan; (5)

whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth, 201 F.3d at 342-43.  In applying Booth, a plan administrator's conflict of interest, where the administrator evaluates the benefits claims and also pays the claims, is "only one factor among many" that must be considered.  Carden v. Aetna Life Ins. Co., 559 F.3d 256, 260 (4th Cir. 2009) (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008)).  "[W]henever a plan administrator employs its interpretive discretion to construe an ambiguous provision in favor of its financial interest, that fact may be considered as a factor weighing against the reasonableness of its decision. . . . The weight accorded to this factor will, of course, depend largely on the plan's language and on consideration of other relevant factors."  Id. at 261.

### B. Plaintiff's ERISA Claim

Neither party disputes the extent of Fine's physical disability.  The sole issue in this litigation is whether his employment income in 2012 exceeded the maximum earnings threshold of 80% of his Indexed Total Monthly Earnings.  See S734.  The $280,000 "profit sharing bonus" that Fine received in December 2012 is at the heart of this action because it caused Fine's Disability Earnings to exceed the maximum earnings threshold, which disqualified him for benefits.  Accordingly, the chief question is whether Sun Life reasonably interpreted "Disability Earnings" to include the type of bonus at issue, given the Policy's terms and the other Booth factors.

Fine raises numerous arguments in support of his ERISA claim, foremost of which is that the language and structure of the Policy unambiguously exclude the profit sharing bonus from Fine's 2012 Disability Earnings for three reasons:  (1) the bonus was not derived from work performed because the 2011 NEC Agreement states the bonus was tied to the company's

performance rather than to Fine's own work performance and because Fine was not actually performing much work for the company by 2012 due to his disability; (2) the common definitions of "earnings" and "bonuses" are distinct, with the former defined as "something (as wages) earned" but the latter defined as "something in addition to what is . . . strictly due;" and (3) the inclusion of the bonus in Disability Earnings renders the Policy internally inconsistent because bonuses are expressly excluded when determining Total Monthly Earnings. In addition to his textual arguments, Fine argues that Sun Life did not engage in a deliberate, principled decision-making process in reaching its decision to terminate his LTD benefits, that Sun Life's retroactive allocation of the bonus to all months in 2012 was inappropriate, and that Sun Life's determination reflects a conflict of interest.

None of these arguments is sufficiently persuasive to overturn Sun Life's reasonable interpretation of the Policy under abuse of discretion review. As a general matter, both parties raise several arguments in support of their contention that the Policy unambiguously favors their opposing interpretations. These conflicting interpretations alone support the Court's conclusion that the Policy is ambiguous regarding whether bonuses like the one at issue are includable as part of a claimant's Disability Earnings. See Phillips v. Brink's Co., 632 F. Supp. 2d 563, 569-70 (W.D. Va. 2009) (finding a benefits plan provision ambiguous, in part based on both sides' arguing its unambiguity in their own favor).

The parties' main dispute concerns the nature of the $280,000 bonus and whether it should be considered employment income "derived from work performed," which would make the $280,000 bonus includable in Fine's 2012 Disability Earnings. See S702 ("Disability Earnings does not include . . . income that is not derived from work performed."). Fine argues that the bonus was not derived specifically from work he performed; rather, it was based solely

on the company's performance as a whole. Sun Life counters that Fine received the bonus as payment for work he performed for the company. In supporting their positions, both parties emphasize the same e-mail from Donoghue informing Fine of his bonus for 2012. This e-mail stated:

> I am pleased to let you know that CIBT will be awarding an $280,000 annual bonus to you in recognition of the company's financial progress this year. This bonus will be paid in a single payment in December. I am deeply appreciative of your good advice this year in helping us develop our strategies for growth. I look forward to working together next year.

S411. Fine points to the first sentence, which links the bonus to "the company's financial progress" rather than to work performed by Fine. Sun Life emphasizes the last two sentences, arguing that they demonstrate that the bonus was for valuable services Fine provided to the company. Although this e-mail indicates that the bonus was in recognition of the company's performance, it also ties the bonus to the "good advice" Fine provided to the company in 2012. Therefore, this e-mail does not greatly enhance either side's position.

In addition to Donoghue's e-mail, both parties rely on the language and structure of the 2011 NEC Agreement to support their divergent characterizations of the bonus. Fine argues that the 2011 NEC Agreement describes the annual bonus as something separate from his mandatory flat-rate salary of $50,000 and as left to the discretion of the board of directors. Fine also argues that this agreement makes clear that the bonus is related only to the company's performance and not to his own performance. Sun Life counters that both the annual salary and the bonus are contained in the section of the 2011 NEC Agreement labeled "Compensation," which supports its conclusion that both types of payment are contemplated as compensation to Fine for the services he would provide to the company under this agreement. In addition, Sun Life cites the definition of "derived," meaning "to flow, spring, issue, emanate, come, arise, originate, have its

derivation from, rather than out of a source." Sun Life contends that under the language of the 2011 NEC Agreement, the bonus arose, flowed, emanated, and was "derived" from the work Fine agreed to perform under the agreement.  Essentially, Sun Life argues that but for Fine's employment with CIBT, he would not have received the bonus and therefore the bonus was derived from work performed in that it was derived from Fine's employment.

The structure of the 2011 NEC Agreement supports Sun Life's position.  Despite the 2011 NEC Agreement's re-characterization of the annual bonus as a "profit sharing bonus," which Sun Life argues was an attempt to bring the bonus outside of the Policy's definition of Disability Earnings, the bonus remained housed in the section labeled "Compensation," just as it had been in the 2010 NEC Agreement.  This section describes "Compensation" as consisting of two main components, the annual $50,000 salary and the annual profit sharing bonus:

> (b) <u>Compensation</u>.
>    (i) During the Term, the Executive:  (A) shall be entitled to (1) an annual fee of $50,000 per year, payable by the Company paid in ratable installments in accordance with the Company's payroll practices, (2) reimbursements for Executive's cell phone, blackberry (or similar devices), and one home office telephone line payable in accordance with the Company's reimbursement policies, and (3) participation in the Company's welfare, employee benefit and fringe benefit programs on the same terms as are applicable to senior executives of the Company; <u>provided</u> that during the Term the Company shall pay the full premium cost for the participation of the Executive and his eligible dependents in the Company's healthcare programs; and (B) shall be eligible to receive from the Company a profit sharing bonus in such amount, if any, as may be determined by the Holdco Board, in its sole and absolute discretion, if the Company's performance is sufficient (as determined by the Holdco Board in its sole and absolute discretion) to warrant such bonus (it being understood that if the Holdco Board determines in its sole and absolute discretion that any such bonus shall be paid to Executive, such bonus payment shall be paid in cash in the calendar year following the calendar year to which such bonus relates at the same time annual bonuses are paid to senior executives of the Company).

S56.[13]  Moreover, "Term" is defined as the period of "[t]he Executive's service as the Non-

Executive Chairman," S55, which means that the bonus was tied specifically to Fine's

performance of services under the 2011 NEC Agreement.[14]  Based on this structure, it was not

unreasonable for Sun Life to conclude that the $280,000 bonus was part of Fine's annual

compensation, meaning the bonus was income "derived from work performed" by Fine under the

2011 NEC Agreement and was, therefore, includable in his Disability Earnings for 2012.

Next Fine argues that Sun Life's inclusion of the bonus within his Disability Earnings

was unreasonable given that the same type of bonus is excluded from the computation of Total

Monthly Earnings.  Specifically, Fine contends that it would be inconsistent and unfair to

claimants for the bonus to be included in Disability Earnings but excluded from Total Monthly

Earnings because this construction "illogically inflates the former and deflates the latter,

arbitrarily increasing the likelihood that the thresholds for eligibility will be triggered."  Mem.

Supp. Fine's Mot. Summ. J. ("Mem. Supp. Fine's MSJ") 22.  In support, Fine relies on

Martorello v. Sun Life Assur. Co., 704 F. Supp. 2d 918 (N.D. Cal. 2010), in which the district

court found that bonuses did not constitute disability earnings under the relevant policy terms,

which were similar to those in the Policy applicable to Fine.[15]  See id. at 919.  In the policy at

---

[13] The "Executive" refers to Fine.  S55.

[14] The full definition of "Term" is as follows:

> (a) Engagement. . . . The Executive's service as the Non-Executive Chairman of the Board and the Holdco Board under the terms of this Agreement shall commence on the Effective Date and continue until terminated for any reason by either party or by the Executive's death (the "Term").

S55.

[15] The policy in Martorello defined "Disability Earnings" as "the employment income an employee receives while partially disabled," and it defined "Total Monthly Earnings" as "the employee's basic monthly earnings as reported by the employer immediately prior to the first date total or partial disability begins."  704 F. Supp. 2d at 919.  The definition of "Total Monthly

issue in Martorello, the definition of "Total Monthly Earnings" expressly excluded bonuses but the definition of "Disability Earnings" was silent as to whether bonuses were included. See id. The court concluded that there was "an ambiguity within the terms of the policy with respect to the inclusion of bonus amounts in the calculation of 'disability earnings'" and it construed that ambiguity in favor of the employee, holding that the bonus had been improperly included in the employee's disability earnings. Id. at 919-20.

Martorello is unpersuasive because the court reached its conclusion under Ninth Circuit precedent, which dictates "that an ambiguity exists wherever two reasonable interpretations of a disputed provision . . . are possible" and that "such ambiguity must be interpreted in favor of the employee." Id. at 920. In contrast, the Fourth Circuit has expressly rejected its former rule "whereby ambiguities in ERISA plans were construed against the drafter whenever a conflict of interest existed." Carden, 559 F.3d at 260 (indicating that the Supreme Court's decision in Glenn forecloses the "application of that rule to curb the discretion given an administrator by a plan"). Moreover, Martorello actually lends support to Sun Life's position in this action because the court acknowledged that the defendant's interpretation of "disability earnings" as including "all income derived from employment, regardless of source characterization (e.g., bonuses, direct salary draw, etc.)" was reasonable, which is all that is required under abuse of discretion review. See Martorello, 704 F. Supp. 2d at 919.

Sun Life further contends that—given the Policy's express exclusion of bonuses from the computation of Total Monthly Earnings—if the Policy intended to exclude bonuses from the computation of Disability Earnings, it would have done so just as explicitly. In addition, Sun

---

Earnings" also specified that "it does not include bonuses, commissions, overtime pay or any other extra compensation." Id.

Life argues that the Policy intentionally excludes bonuses from Total Monthly Earnings and

includes them in Disability Earnings "to provide disability benefits that will protect a certain

percentage of an employee's 'basic' earnings (i.e. salary), while at the same time prevent an

employee from 'double-dipping' by characterizing his post-disability earnings as bonuses or

some other form of non-salary compensation to avoid inclusion in the Disability Earnings

Calculation." Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. Supp. MSJ") 23. This

reasoning has been approved by at least one federal appellate court. See Riddell v. Unum Life

Ins. Co. of Am., 457 F.3d 861, 864-65 (8th Cir. 2006). Sun Life further elaborates on this point:

> The definition of Total Monthly Earnings expressly excludes bonuses and all
> extra compensation, and instead simply calculates an employee's "basic monthly
> earnings," i.e., the salary component of wages that are protected by the Policy.
> The definition of Disability Earnings, in contrast, includes all income received
> that is derived from work performed post-disability. As in Riddell, the definition
> of TME is designed to produce a fair, but not artificially generous, disability
> benefit, while the definition of Disability Earnings is designed to permit the
> insurer to reduce or eliminate the disability benefit when a participant is able to
> generate a certain level of employment income, regardless whether characterized
> as bonuses, commissions or otherwise, that sufficiently replaces his basic salary.

Def.'s Mem. Supp. MSJ 25. Based on this explanation regarding the purposes of the Policy, Sun

Life's interpretation of the definition of Disability Earnings and its application of that definition

to the bonus at issue was reasonable and consistent with the Policy's definition of Total Monthly

Earnings. That conclusion is consistent with the Riddell and Martorello decisions, which both

found under similar policy terms that interpreting "disability earnings" to include bonus pay was

reasonable.

Fine's argument that Sun Life did not engage in a deliberate, principled decision-making

process in deciding to terminate Fine's LTD benefits is unsupported by the administrative record,

which shows that Sun Life thoroughly investigated both Fine's medical condition and finances.

Sun Life also engaged the services of two separate third-party CPAs, Bannon and Bristol, to

review Fine's financial records and determine which sources of income were or were not excludable from Disability Earnings, as well as to determine the amount of any benefit to which Fine was entitled.  In both his July and August 2011 reports, Bannon mentioned that any annual discretionary bonus under the NEC Agreements, "when received," "would be considered Disability Earnings and should be pro-rated on a retrospective basis" over the period for which it was paid.  S40-42, S1972-73.  After Fine appealed its decision, Sun Life submitted the evidence to Bristol, a different CPA, who reached the same conclusion as Bannon.  S614-15.  Given this evidence, Fine fails to establish that the process Sun Life employed in making its denial decision was not deliberate and reasonable.

Fine further argues that Sun Life's retroactive allocation of the bonus to each month in 2012 was arbitrary.  Not only is it a common accounting technique used by ERISA plans, it often favors claimants by increasing the amount they can receive before they reach the maximum threshold for ineligibility.  Because the Policy is silent as to whether retroactive allocation would apply to lump sum earnings payments, it was a reasonable exercise of Sun Life's discretion to use this technique as opposed to considering the full bonus only for the month of December 2012 (when Fine actually received the bonus).

Lastly, Fine argues that Sun Life's decision reflects a conflict of interest because Sun Life was motivated by a desire "to avoid paying a substantial monthly benefit for 20 years."[16] Mem. Supp. Fine's MSJ 29.  Although there is an inherent conflict "when a plan administrator serves in the dual role of evaluating claims for benefits and paying the claims," such a conflict is "just one of the 'several different, often case-specific, factors' to be weighed together in

---

[16] Fine was 47 years old when he applied for LTD benefits and could potentially continue to receive LTD benefits until age 67 under the terms of the Policy.  See S693.

determining whether the administrator abused its discretion," <u>Carden</u>, 559 F.3d at 260 (quoting

<u>Glenn</u>, 554 U.S. at 117); however, protective measures can be utilized to minimize that conflict.

<u>See</u> <u>Glenn</u>, 554 U.S. at 117 ("It [the conflict of interest factor] should prove less important

(perhaps to the vanishing point) where the administrator has taken active steps to reduce

potential bias and to promote accuracy, for example, by walling off claims administrators from

those interested in firm finances, or by imposing management checks that penalize inaccurate

decisionmaking irrespective of whom the inaccuracy benefits.").

   Sun Life has taken such protective measures.  Sun Life is structured such that its claims

department is separate from its appeals department, and the claims and appeals departments are

separate from its financial, actuarial, and underwriting departments.  Saidla Decl. ¶¶ 8, 10.[17]

Different personnel are employed by the claims; appeals; and financial, actuarial, and

underwriting departments.  <u>Id.</u>  Personnel in the claims and appeals departments have no input in

decisions made by personnel in the financial, actuarial, and underwriting departments, and vice

versa.  <u>Id.</u>  In addition, Sun Life does not provide financial or other incentives to its employees to

deny or terminate claims, and it uses third-party consulting accountants, such as Bannon and

Bristol, to review and answer financial questions that arise in connection with LTD claims.  <u>Id.</u>

¶¶ 7-11.  Those accountants are not employees of Sun Life, and their compensation by Sun Life

does not vary according to the outcome of their review.  <u>Id.</u> ¶¶ 11-12.  Therefore, Sun Life has

adequately minimized the conflict of interest that exists as a result of its dual role as the

evaluator and payor of claims, and there is no evidence that this structural conflict influenced its

---

[17] "Saidla Decl." refers to the Declaration of Kathleen Saidla, who is a Long Term Disability
Claims Senior Consultant in Sun Life's appeals department; she handled the internal appeal of
Fine regarding the termination of his LTD benefits.  Saidla's Declaration was attached as Exhibit
1 to Sun Life's Memorandum in Support of Its Motion for Summary Judgment.

claims decision in this matter. Under these circumstances, the conflict of interest <u>Booth</u> factor does not outweigh all of the above factors weighing in favor of finding Sun Life's decision reasonable.[18]

For all the foregoing reasons, the Court finds that Sun Life did not abuse its discretion by determining Fine's $280,000 bonus for 2012 constituted Disability Earnings and then terminating Fine's LTD benefits effective January 1, 2012. The only question remaining is whether Sun Life can recoup any of the amount it paid to Fine after January 1, 2012.

### C. <u>Sun Life's Counterclaim for Overpayment</u>

Sun Life has filed a counterclaim for restitution under § 502(a)(3) of ERISA, codified at 29 U.S.C. § 1132(a)(3)(B), to recover $203,121.01, the amount it overpaid to Fine after his eligibility terminated on January 1, 2012, and both parties have moved for summary judgment on the counterclaim.[19] No provision in the Policy provides Sun Life the authority to recover erroneously paid benefits. Accordingly, Sun Life relies on alternative theories of recovery. First, Sun Life argues that "rescission and restitution" is an equitable remedy within the scope of § 502(a)(3) of ERISA and that this remedy entitles it to rescission of and restitution for the

---

[18] These protective measures, in addition to all of the foregoing factors weighing in favor of finding Sun Life's decision reasonable, undermine Fine's argument that Sun Life was simply "determined to deny Fine's claim from the outset" as shown by its initial decision denying Fine's LTD claim based on its finding that he was not medically disabled. Moreover, Sun Life's decision to change that initial denial contradicts Fine's view of Sun Life's intent.

[19] This amount is comprised of the $200,000 in payments Fine received from January 2012 through August 2013, plus a purported partial overpayment for December 2011. The issue of whether any amount was overpaid to Fine for December 2011 is not properly before the Court. The administrative appeal process for that decision had not run its course at the time the Complaint was filed, and the Complaint only asks the Court to overturn Sun Life's decision finding Fine ineligible for benefits as of January 1, 2012. Although the counterclaim includes the alleged overpayment for December 2011 within the total amount sought, neither party has proffered any arguments regarding whether it was reasonable for Sun Life to belatedly apply the proportionate loss formula to Fine's December 2011 benefit.

transactions under which it overpaid Fine. Alternatively, Sun Life contends that it is entitled to receive restitution through an equitable lien on the entire amount presently in Fine's JF Schwab bank account ($43,063.82), in which Fine deposited most of his Sun Life benefits, and on the proceeds of the sale of Fine's apartment for at least $89,864. Fine responds that <u>Great-West Life & Annuity Insurance Co. v. Knudson</u>, 534 U.S. 204 (2002), and <u>Sereboff v. Mid Atlantic Medical Services, Inc.</u>, 547 U.S. 356 (2006), require a party in an ERISA action seeking restitution to trace the overpaid funds directly to funds in the recipient's possession, which, Fine argues, Sun Life cannot do because the overpaid funds have been comingled with his general funds and dissipated.[20]

"A fiduciary may bring a civil action under § 502(a)(3) of ERISA '(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.'"[21] <u>Sereboff</u>, 547 U.S. at 361 (quoting ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3)). The Supreme Court has construed § 502(a)(3)(B) of ERISA "to authorize only 'those categories of relief that were <u>typically</u> available in equity.'" <u>Id.</u> at 356 (quoting <u>Mertens v. Hewitt Associates</u>, 508 U.S. 248, 255-56 (1993)) (emphasis in original).

---

[20] Fine also argues he is entitled to summary judgment on Sun Life's counterclaim because he was always eligible for LTD benefits and, therefore, no overpayment exists for Sun Life to recoup. Given the Court's previous conclusion that Fine became ineligible to receive benefits as of January 1, 2012, this argument fails.

[21] The Fourth Circuit has held that a plan administrator "is clearly a fiduciary." <u>U.S. Steel Mining Co. v. Dist. 17, United Mine Workers of Am.</u>, 897 F.2d 149, 152 (4th Cir. 1990); <u>see also</u> <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 498 (1996) ("[A] 'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." (quoting ERISA § 3(21)(A), codified at 29 U.S.C. § 1002(21)(A))).

Sun Life's counterclaim seeks restitution. "However, not all relief falling under the rubric of restitution is available in equity." Knudson, 534 U.S. at 212. Whether restitution "is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought." Id. at 213 (internal quotation marks omitted). The Supreme Court has elaborated on the distinction between legal and equitable restitution:

> In cases in which the plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution at law through an action derived from the common-law writ of assumpsit. 1 Dobbs § 4.2(1), at 571. In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." Restatement of Restitution § 160 cmt. a, at 641-42 (1936). Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).
>
> In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. See 1 Dobbs § 4.3(1), at 587-88; Restatement of Restitution, supra, § 160 cmt. a, at 641-42. A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Restatement of Restitution, supra, § 215 cmt. a, at 867. Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

Id. at 213-14 (some citations omitted) (all emphases in original).

In Knudson, the petitioners, an insurance company, the health plan, and the former employer, brought an ERISA action for specific performance of the reimbursement provision of a health plan after the injured plan beneficiary recovered from a third party tortfeasor. Id. at 207-09. The plan's reimbursement provision provided for the recovery of payments made by the

third party to the beneficiary. Id. at 207. The Supreme Court, however, held that the petitioners were seeking legal, not equitable, relief because the proceeds from the settlement of the tort action to which the petitioners laid claim were not in the beneficiary's possession; rather, the funds had been placed in a "Special Needs Trust" under state law. Id. at 214.

The Court again addressed the circumstances under which a fiduciary may sue a beneficiary for reimbursement of medical expenses paid by an ERISA plan in Sereboff but this time found that the nature and basis of the relief sought were equitable. The fiduciary of a health plan brought suit against plan beneficiaries to enforce the reimbursement provision of the plan. 547 U.S. at 360. The fiduciary sought reimbursement for amounts paid for beneficiaries' medical expenses after the beneficiaries obtained a settlement with third party tortfeasors. Id. The beneficiaries agreed to set aside from their tort recovery the amount claimed by the fiduciary, and they preserved this sum in an investment account pending the outcome of the suit. Id. The Court held that the fiduciary was seeking equitable, not legal, relief because, unlike in Knudson, the fiduciary sought "specifically identifiable funds that were within the possession and control of the [beneficiaries]—that portion of the tort settlement due [to the fiduciary] under the terms of the ERISA plan, set aside and preserved [in the beneficiaries'] investment accounts." Id. at 362-63.

First, the Court is not convinced that Sun Life is entitled to rescission of each of its monthly payments to Fine after January 1, 2012. Sun Life mainly relies on three cases in which courts found that rescission was a permissible remedy under § 502(a)(3) of ERISA. See Griggs v. E.I. DuPont de Nemours & Co., 385 F.3d 440 (4th Cir. 2004); Adams v. Brink's Co., 261 F. App'x 583 (4th Cir. 2008); Ayalon v. Atlantastaff, Inc. Grp. Med. & Dental Ben. Program, 95 F.3d 1156 (9th Cir. Aug. 21, 1996) (unpublished table decision). In both Fourth Circuit cases

relied upon, the court allowed beneficiaries to rescind particular elections they had made under their respective benefits plans that affected the amount of benefits to which they were entitled. In Ayalon, the Ninth Circuit held in part that a plan administrator did not abuse its discretion by retroactively rescinding a beneficiary's medical coverage based on the beneficiary's material misstatements regarding a pre-existing condition. The court's decision was based on the unambiguous language in the plan voiding coverage if material misstatements were made in connection with a person's medical coverage and permitting the plan administrator to recover "any benefits paid" with respect to that person.

These cases are readily distinguishable from the instant counterclaim in which Sun Life seeks to rescind monetary payments. As the Court explained in Knudson, "'[e]quitable' relief must mean something less than all relief." Knudson, 534 U.S. at 209 (emphasis in original). If a plan administrator or fiduciary could always seek rescission of monetary payments that were later determined to be improper, then a plan could always recover all overpayments it made, thereby rendering the "equitable" modifier in § 502(a)(3)(B) meaningless. Cf. id. at 211 (explaining that, without the limitations upon the availability of injunctions under § 502(a)(3)(A) that equity typically imposes, the "statutory limitation to injunctive relief would be meaningless, since any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction"). Moreover, rescinding payments and holding the beneficiary liable for the entire rescinded amount, without regard to what became of the payments after they were received, would have the effect of "impos[ing] personal liability on the defendant." Id. at 213-14. Most significantly, unlike in Ayalon, no provision of the Policy permits rescission to recover overpayments. Therefore, rescission is not an appropriate equitable basis for Sun Life's restitution counterclaim.

Next, Sun Life argues that it is entitled to restitution through an equitable lien on the present value of one of Fine's bank accounts and on a portion of the proceeds from the eventual sale of Fine and his wife's apartment. To reiterate, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." Knudson, 534 U.S. at 213-14. "[W]here the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, . . . the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Id. (alterations in original). It is Sun Life's burden to establish its claim for equitable relief; to do so, it must show both that Fine "once had property legally or equitably belonging to [Sun Life]" and that he "still holds the property or property which is in whole or in part its product."[22] Epolito v. Prudential Ins. Co. of Am., 737 F. Supp. 2d 1364, 1382 (M.D. Fla. 2010) (quoting Restatement (First) of Restitution § 215 cmt. a (1936)).

---

[22] Sun Life relies on three cases from other circuits in support of its contention that it is entitled to recoup the overpayment without having to trace to specific funds in Fine's possession. See Brown v. UMWA 1985 constr. Worker's Pension Plan, No. 2:10-cv-554 (N.D. Al. Apr. 22, 2011) (Report and Recommendation), adopted by No. 2:10-cv-554 (N.D. Al. Sept. 12, 2011); Sheward v. Bechtel Jacobs Co. LLC Pension Plan for Grandfathered Employees, No. 3:08-cv-428, 2010 WL 841301 (E.D. Tenn. Mar. 4, 2010); Johnson v. Ret. Program Plan for Employees of Certain Employers at the U.S. Dep't of Energy Facilities at Oak Ridge, Tenn., No. 3:05-cv-588, 2007 WL 649280 (E.D. Tenn. Feb. 27, 2007).

Each of these cases is distinguishable and unpersuasive. In both Brown and Johnson, the plan was allowed to recoup its overpayment to beneficiaries by setting it off against future benefits the plan paid to those beneficiaries. Therefore, the courts did not need to consider tracing principles. In Sheward, the court first found that a plan's decision to recoup an overpayment by offsetting it against future benefits paid to a beneficiary was reasonable under express language in the plan that provided it with the responsibility to "correct errors." The court also found it was not inequitable for the plan to do so, given that the beneficiary had received a lump-sum double payment of his pension from a related plan and he had known that the plan intended to seek recoupment. Based on these findings, the court awarded a lump-sum amount to the plan, which represented the remaining unrecovered amount of the overpayment. It does not appear that the beneficiary opposed the lump-sum award based on Knudson and Sereboff, so the court did not address tracing principles. Sun Life has not argued that any of the

Of the benefit payments Fine received from January 2012 through August 2013, all but two months' worth were deposited into his JF Schwab account, which later dropped to a balance of $9,943.61 in December 2013. Accordingly, Sun Life is only entitled to an equitable lien on the bank account in the amount of $9,943.61; any funds deposited into the account after that time did not come from Sun Life and Sun Life is, therefore, not entitled to an equitable lien on them. See Restatement (First) of Restitution § 212 ("Where a person wrongfully mingles money of another with money of his own and makes withdrawals from the mingled fund and dissipates the money so withdrawn, and subsequently adds money of his own to the fund, the other can enforce an equitable lien upon the fund only for the amount of the lowest intermediate balance . . . .").

Sun Life correctly asserts, however, that the mere fact that Fine spent the majority of the Sun Life funds that were deposited into his JF Schwab account does not automatically bar equitable restitution. Instead, Sun Life can still recover if it can trace the spent funds to an identifiable product in Fine's possession. See Bilyeu v. Morgan Stanley Long Term Disability Plan, 683 F.3d 1083, 1096 (9th Cir. 2012); Restatement (First) of Restitution § 161 cmt. e (1937) ("An equitable lien can be established and enforced only if there is some property which is subject to the lien. Where property is subject to an equitable lien and the owner of the property disposes of it and acquires other property in exchange, he holds the property so acquired subject to the lien . . . . So also, where the property which is subject to the lien is mingled with other property in one indistinguishable mass, the lien can be enforced against the mingled mass . . . . Where, however, the property subject to the equitable lien can no longer be traced, the equitable lien cannot be enforced . . . ."); id. § 215(1) ("[W]here a person wrongfully disposes of the

---

terms of the Policy grant it authority to correct errors through recouping overpayments, and Sun Life is seeking a lump-sum award as opposed to a setoff against future benefits. Therefore, tracing rules apply to its restitution claim.

property of another but the property cannot be traced into any product, the other has merely a

personal claim against the wrongdoer and cannot enforce a constructive trust or lien upon any

part of the wrongdoer's property."); id. § 215 cmt. a ("[I]f it is shown that the property or its

proceeds have been dissipated so that no product remains, . . . the claimant cannot enforce . . . an

equitable lien upon other property of the wrongdoer, and has only a personal claim against the

wrongdoer.").

     Sun Life has failed to meet its burden of tracing the spent overpayments to a product still

in Fine's possession.  It attempts to trace its overpayments into improvements made to Fine's

apartment, which is currently for sale, based on Fine's expenditure of funds to renovate the

apartment during the relevant time period.  Specifically, Sun Life contends:

> Between June 2012 and August 2013, Plaintiff spent $652,712 from the JF
> Schwab account on [a]partment renovations.  Pl.'s Dep. at 57.  The total spent
> from that account on all items during the same time period was $1,089,499.44.
> Thus, the percentage of funds spent on the [a]partment from the JF Schwab
> account between June 2012 and August 2013 was 59.9%.   Applying his
> percentage to the Sun Life deposits during the relevant time ($150,000) yields
> approximately $89,864 of sun Life funds that are traceable to the improved
> [a]partment.

Def.'s Opp'n 35.  This percentage approach does not satisfy the "strict tracing rules" governing

equitable restitution.  The money withdrawn from the JF Schwab account was spent to pay for

renovation services rather than to acquire other property.  Expending the funds on services rather

than on other property constituted a dissipation of those funds.  And, even if such expenditures

did not constitute a dissipation of the funds such that a product of the Sun Life funds still existed,

Sun Life has failed to show that Fine still has possession of that product, given that Fine owns

the apartment as a tenancy by the entirety with this wife.  Cf. Bd. of Trustees for Hampton Roads

Shipping Ass'n-Int'l Longshoremen's Ass'n v. Ransone-Gunnell, No. 2:09-cv-l65, at 30-31 n.10

(E.D. Va. Aug. 13, 2011) (finding that a beneficiary's transfer of the "vast majority" of

settlement funds to her husband's account "had the effect of dissipating the potentially traceable funds in [the beneficiary's] possession" such that the plan administrator could not reach those funds). Sun Life has not cited any authority supporting its position that it can obtain an equitable lien on property (or on the sale proceeds of property) held in a tenancy by the entirety, especially where Sun Life is a creditor only of Fine and not a creditor of Fine's wife. Therefore, Sun Life has not met its burden of establishing its entitlement to an equitable lien on any portion of the eventual sale proceeds of Fine's apartment.

Lastly, the parties dispute whether Sun Life has properly raised an unjust enrichment claim and, if so, whether to characterize that claim as a common law claim under Provident Life & Acc. Insurance Co. v. Waller, 906 F.2d 985, 989, (4th Cir. 1990), or as an appropriate equitable remedy falling within the scope of ERISA § 502(a)(3). Waller has been limited to situations in which a specific plan provision provides for reimbursement of erroneously paid benefits. See Life & Acci. Ins. Co. v. Cohen, 423 F.3d 413, 426 (4th Cir. 2005). Because there is no such provision in the Policy at issue, Sun Life cannot succeed on an unjust enrichment claim under Waller. Likewise, Sun Life cannot succeed on an unjust enrichment claim under ERISA because the remedy would still be equitable restitution, for which Sun Life cannot meet the tracing requirements. See Food Employers Labor Relations Ass'n & United Food & Commercial Workers Health & Welfare Fund v. Dove, No. Civ. A. GJH-14-1273, 2014 WL 6388399, at *2 (D. Md. Nov. 13, 2014) (Report and Recommendation) (treating "an actionable [ERISA] claim for unjust enrichment as encompassing a related claim for restitution in the amount the defendant [beneficiary] ha[d] been unjustly enriched" and denying the plaintiff plan recovery because beneficiary did not possess the funds sought).

III.    CONCLUSION

For the reasons stated above, Sun Life's motion for summary judgment will be granted as to plaintiff's ERISA claim and granted in part as to the counterclaim in the amount of $9,943.61, and Fine's motion for summary judgment will be denied as to his ERISA claim and granted in part as to defendant's counterclaim by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 6th day of April, 2015.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

31